UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HAROLD KENNETH HARRIS, JR.,

Plaintiff,

-against-

METRO-NORTH COMMUTER RAILROAD,

Defendant.

12-cv-543 (NSR)

MEMORANDUM OPINION AND ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiff Harold Kenneth Harris, Jr. ("Plaintiff") commenced the instant action against his employer, the Metro-North Commuter Railroad ("Defendant"), pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60, alleging Defendant was negligent in ensuring his work environment was sufficiently safe. Specifically, Plaintiff's complaint alleges Defendant failed to ensure that his repeated opening of doors between rail cars would not cause him certain ergonomic injuries to his elbow.

Defendant now moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment, asserting that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. Defendant's motion is based in large part on a *Daubert* motion to preclude testimony of Plaintiff's experts, Dr. Stephen J. Morrissey ("Morrissey") and Dr. Philip Luchini ("Luchini"). Defendant avers that Morrissey and Luchini's testimonies are not based on any scientific or technical method as required by Rule 702 of the Federal Rules of Evidence, that Plaintiff's claim is barred either by the three-year FELA statute of limitations or by the Locomotive Inspection Act as a design defect claim, and that Plaintiff has proffered insufficient evidence of Defendant's negligence or a causal connection to Plaintiff's injuries. For the following reasons, Defendant's motion for summary judgment is denied, and its motion to

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/8/2014

preclude expert testimony is denied without prejudice to renewal as a motion *in limine*.

## I. FACTS AND EVIDENCE

The facts are gleaned from the parties' 56.1 statements,[1] affidavits, and exhibits[2] submitted with this motion and are not in dispute except where noted.

Plaintiff began his employment with another railroad in or around 1976, and with Defendant in or around 1983. Since 1988 he has worked as an assistant conductor or conductor on Defendant's trains. Plaintiff's duties include, among other things, entering and exiting the barrel doors at the ends of train cars while the train is moving in order to collect tickets. Plaintiff testified that he worked multiple cars per trip, going back and forth between cars via the heavy barrel doors. He complains that the repeated opening of these doors throughout his employment has caused repetitive stress injuries—in particular, compression of the ulnar nerves in his elbows. Plaintiff testified that 80-85% of his work since 1988 has been on M-2 train cars, the remainder being on M-4 and M-6 cars. Plaintiff found all the M-2 barrel doors and roughly half the M-6 barrel doors difficult to open. He testified that there is sometimes a suction when trying to open the doors, which makes them very difficult to open. He sometimes uses one arm or the other, and sometimes both arms, to open the doors.

[1] Defendant sets forth virtually no material facts in its 56.1 statement, and instead inappropriately proffers its factual statement in an affidavit provided by Defendant's counsel. *Cf.* Local Civ. R. 56.1(a). Defendant then complains that Plaintiff's additional material facts should be disregarded because Plaintiff introduced them as being "not in dispute" instead of contending that those facts demonstrate "a genuine issue to be tried" as required by Local Civil Rule 56.1(b). The parties are reminded that Local Civil Rule 56.1 exists to aid the Court in efficiently identifying issues of fact, and it is to be followed strictly. Failure to follow the Rule impedes the realization of its purpose and leads to unnecessary bickering between attorneys, as has happened in the instant case. Regardless, the Court reviews the record as submitted to decide the motion for summary judgment on the merits.

[2] Defendant submits entire deposition transcripts despite the Court's instructions to the contrary in its Individual Rules of Practice, (Rule 3.G.iv.), and fails to include a table of contents in its memoranda of law as required, (Rule 3.B.). Plaintiff greatly exceeds the Court's page limit for its memorandum of law, (Rule 3.B.), without having sought leave to file such a lengthy document. The parties are reminded that individual rules of practice are likewise to be followed strictly.

Prior to bringing the instant lawsuit, Plaintiff never complained in writing to a supervisor about problems with the barrel doors. Plaintiff does not recall anyone else complaining to a supervisor about the doors in his presence. However, when he had a problem with a door sometime in 2010, "maybe two months after spring," he advised the maintenance department about the problem in writing by filling out a card on the train. (Rios Aff. Ex. C, Pl.'s Dep. 111:11–112:20.) It was on this occasion that Plaintiff first experienced a sharp pain in the back of his elbows going down to his hands. After visiting a neurologist and a surgeon, Plaintiff underwent surgery on his left elbow, described as "an anterior intramuscular transposition ulnar nerve," to relieve "Ulnar nerve compression." (Rios Aff. Ex. D, Pl.'s Supplemental Answers to Interrogs. ¶ 15.)

Luchini, Plaintiff's treating physician, testified that Plaintiff first became a patient in 1996 after a window frame on a train car fell on Plaintiff, causing injuries to Plaintiff's elbows, right shoulder, and back. Plaintiff underwent shoulder surgery as a result. Luchini testified that symptoms associated with Plaintiff's elbows subsided. In May 2000, Luchini treated Plaintiff for pain in his right thumb and right hip. In March 2001, Luchini treated Plaintiff for injuries to his left shoulder and right hand which resulted from Plaintiff having to restrain a passenger involved in an altercation. Plaintiff underwent surgery on his right hand to resolve a carpel tunnel injury. In October 2003, Luchini treated Plaintiff for tendonitis along the medial aspect of the left elbow, also known as "tennis elbow," with a steroid injection. In April 2004, Luchini treated Plaintiff for tendonitis of the right elbow with a steroid injection. In July and September 2004, Luchini again treated Plaintiff's left elbow tendonitis with steroid injections.

In April 2007, Plaintiff again sought treatment from Luchini. Plaintiff provided Luchini with his medical history showing he had tennis elbow surgery on his right elbow in June 2006.

Plaintiff reported that he had fallen on his left knee in February 2006. Luchini treated Plaintiff's recurring right elbow pain and tendonitis of the left knee with steroid injections. In October 2007, Plaintiff returned for treatment after his right forearm got pinned between automatic doors that were closing. Luchini performed surgery on Plaintiff's right arm in March 2008 to decompress the posterior interosseous nerve which had been damaged by the closing doors. In May 2009, Plaintiff returned complaining of pain in the right arm near the posterior interosseous nerve and of right elbow tendonitis, which he associated with weightlifting. Luchini prescribed an anti-inflammatory medicine for the tendonitis. In April 2010, Luchini treated Plaintiff for right shoulder pain, which had lasted two weeks, with a steroid injection. Plaintiff attributed the shoulder pain to weightlifting.

On June 14, 2010, Plaintiff sought treatment from Luchini for pain in both elbows which, according to Luchini, appeared to suggest compression of the ulnar nerves. Plaintiff testified that he was experiencing a sharp pain in the back of his elbows going down to his hands, and that such pain was in a different part of his elbows than his previous injuries. Luchini testified that a problem with the ulnar nerve is distinct from tendonitis in the elbow (which is commonly referred to as "tennis elbow"). Luchini's contemporary records do not indicate the cause of the ulnar nerve compression. Luchini referred Plaintiff to a neurologist who saw Plaintiff on July 27, 2010.[3] On January 3, 2011, Luchini performed surgery on the ulnar nerve in Plaintiff's left elbow. On February 10, 2011, Luchini saw Plaintiff and noted Plaintiff may need surgery to relieve ulnar nerve compression in the right elbow as well. It appears Plaintiff has not yet had surgery on his right elbow.

[3] Plaintiff testified that the neurologist told him he had nerve problems and suggested he see another doctor, at which time Plaintiff "went right to Dr. Lu[]chini." (Rios Aff. Ex. C, Pl.'s Dep. 117:4-9.)

Plaintiff brought the instant action on January 23, 2012. Subsequently, Plaintiff sought treatment from Luchini on March 29, 2012, for right shoulder and lower back injuries resulting from Plaintiff throwing a train switch on March 27, 2012; on September 20, 2012, for a right thumb injury resulting from being struck by a can; in January 2013 for the same right thumb injury; and on June 24, 2013, for tendonitis in the right shoulder rotator cuff.

In or around 1997, Sandler Occupational Medicine Associates, Inc. ("SOMA") conducted an ergonomic assessment of the various tasks performed by, *inter alia*, Defendant's train conductors on M-2 and M-4 cars. SOMA produced a report ("SOMA Report") for Defendant outlining potential risks and ways to mitigate those risks. The SOMA Report acknowledged that "stressors for the right shoulder included shoulder flexion (45º - 90º) and loading while opening barrel doors." (Rios Aff. Ex. G, SOMA Report 11.) SOMA modeled opening the barrel doors based on the average American male, comparing the joint strength capability for forces of 24 pounds and 60 pounds. Where the required door opening force is 24 pounds, the SOMA Report found that 99% of males and 82% of females have the shoulder strength capacity to open the doors. However, where the required door opening force is 60 pounds, the SOMA Report found that 80% of males and only 3% of females have the shoulder strength capacity to open the doors. Notably, the analysis "d[id] not take into account the repetitive nature of opening doors." (*Id.* at 14.) Accordingly, the SOMA Report recommended "that 95% of males and 75% of females . . . be accommodated." (*Id.*) Also noting that "barrel doors between the cars (M4/M6) sometimes stick because of tight sealing gaskets," (*id.* at 12), the SOMA Report recommended that Defendant properly maintain the doors to reduce the likelihood of shoulder injuries and "[i]nvestigate the feasibility of modifying sealing gaskets so that the effort required for opening and closing doors is minimized (preferably kept within 25lb)," (*id.*).

On June 13, 2012, Morrissey, Plaintiff's proffered ergonomics expert, conducted a site visit at Grand Central Station to measure the force required to open barrel doors on three M-2 and three M-6 cars. Defendant's counsel and expert, Ronald D. Schaible ("Schaible"), were present. On the M-2 cars, the average handle opening force was 19.9 pounds according to Morrissey and 20 pounds according to Schaible; the average force to push doors open was 37.5 pounds according to Morrissey and 35.1 pounds according to Schaible; and the average force to pull doors open was 46.1 pounds according to Morrissey and 41.5 pounds according to Schaible. On the M-6 cars, the average handle opening force was 17.3 pounds according to Morrissey and 17.8 pounds according to Schaible; the average force to push doors open was 32 pounds according to Morrissey and 33.2 pounds according to Schaible; and the average force to pull doors open was 36.2 pounds according to Morrissey and 34.7 pounds according to Schaible.

Anne Kirsch ("Kirsch") is Defendant's Chief Safety and Security Officer. She understands that repetitive stress injuries result "from repeated activity of a specific nature that creates stress and causes injury." (Rios Aff. Ex. F, Kirsch Dep. 65:6-8.) She testified that she is aware weight, genetics, body position, force, temperature, size, weight and shape of tools, and vibrations are ergonomic risk factors which may contribute to the development of conditions, illnesses, or injuries. Kirsch testified that Defendant's Claim Department and Safety Department were aware of these risk factors for at least 20 years prior to her deposition on October 24, 2012. Defendant trains its conductors on how to position themselves when opening windows and doors. Defendant also trains employees across the board to be aware of "overall body mechanics . . . testing for force, testing for pressure, [and] not overexerting [them]sel[ves]." (*Id.* at 53:22-24.) Kirsch testified that she has passed from car to car on passenger trains on occasion, but would not necessarily use the word "substantial" to describe the amount of physical force needed

to open the barrel doors. Based on her experience, Kirsch testified that the doors generally require a similar amount of force to open, regardless of the train car's make and model. She did not recall whether Defendant evaluated the risk factors or stressors associated with opening the end doors. Kirsch testified that the Safety Department does not have copies of the SOMA Report in its office.

Defendant performs inspections and maintenance of M-2 and M-6 train cars at its New Haven maintenance facility. James Heimbuecher ("Heimbuecher") is Defendant's Mechanical Department Assistant Facilities Director at New Haven. Heimbuecher is tasked with ensuring that all maintenance and inspection requirements for trains are performed timely, efficiently, and effectively. He testified that he was unaware of the SOMA report or that the amount of force used to open the barrel doors could have an impact on causing employee injuries. According to Heimbuecher, Defendant began utilizing M-2 train cars in the 1970s and M-6 train cars in the 1990s. The barrel doors on both types should require the same amount of force to open when properly maintained. Defendant possesses gauges that measure the amount of force in foot pounds needed to lift or move objects. As of February 25, 2013, Heimbuecher did not know whether Defendant had considered testing the M-2 and M-6 barrel doors to determine how much force is required to open them.

Brandee Velez ("Velez") works for Defendant as an industrial hygienist. He took a course in ergonomics at the NYU Medical Center in January 2000. After completing this course, Velez understood that "if anybody has to extend their arm out and use a device by pushing in and pulling and twisting their hand back and forth repetitively," this action "is exposing the person to ergonomic risk factors for repetitive stress injuries." (Rios Aff. Ex. E, Velez Dep. 81:15-23.) Velez acknowledged that the barrel doors are "heavy" and "require a considerable amount of

physical force to be able to open." (*Id.* at 57:3-11.) He agreed that the heaviness of the doors is a concern "in terms of frequency that train personnel have to walk through" them. (*Id.* at 57:14-20.) The self-described ergonomics go-to guy, Velez testified that he was unaware of any conductor duties that exposed them to any ergonomic risk factors for repetitive stress injuries. He also testified that no railroad employees "other than the secretarial administrative employees . . . have been exposed to any of the ergonomic risk factors for repetitive stress injuries." (*Id.* at 68:10-18.) According to Velez, Defendant's employees are encouraged to advise their supervisors of any work-related issue that they believe may cause them injury so that Defendant may resolve the issue. Defendant has a Safety Department which does a review of injuries that occur and passes the review on to senior management. Management then makes policy decisions regarding what it can do to reduce injuries. When asked whether Defendant's Safety Department should consider as an ergonomic risk factor the repetitive force associated with conductors' opening the heavy barrel doors, Velez responded that he "d[id]n't have enough information to make a statement on that." (Velez Dep. 111:8-112:3.)

## II. SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine dispute or issue[4] of material fact by pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P.

[4] As the 2010 amendment to the Rule replaced "issue" with "dispute" because the term "better reflects the focus of a summary judgment determination," Fed. R. Civ. P. 56 advisory committee's note on 2010 amendments, the terms are used interchangeably.

56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

Once the moving party has fulfilled its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). In reviewing the record, "the judge's function is not himself to weigh the

evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."), nor is it to determine a witness's credibility, *Anderson*, 477 U.S. at 249. Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250.

The summary judgment standard is considerably more plaintiff-friendly in FELA cases. *See Kendall v. Metro-North Commuter R.R.*, No. 12 Civ. 6015 (DLC), 2014 WL 1885528, at *2 (S.D.N.Y. May 12, 2014). In the Second Circuit, "the right of the jury to pass on factual issues must be liberally construed," *Williams v. Long Island R.R.*, 196 F.3d 402, 407 (2d Cir. 1999), because FELA is "'a broad remedial statute' whose objective is 'to provide a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer,' and which is to be 'liberally construed' to achieve that objective," *Greene v. Long Island R.R.*, 280 F.3d 224, 229 (2d Cir. 2002) (quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561–62 (1987)).

**III. STATUTE OF LIMITATIONS**

Defendant asserts that Plaintiff's claim must be dismissed for failure to bring the action within the three-year limitations period applicable to FELA actions. *See* 45 U.S.C. § 56 ("No action shall be maintained under this act . . . unless commenced within three years from the day the cause of action accrued."). Defendant asserts that "the burden is on the plaintiff to allege and prove that his claim was brought within the limitations period." *Hernandez v. Metro-North Commuter R.R.*, No. 11 Civ. 644 (JPO), 2013 WL 822322, at *2 (S.D.N.Y. Mar. 6, 2013); *accord Emmons v. S. Pac. Trasp. Co.*, 701 F.2d 1112, 1118. A discovery rule applies to gradual

injuries such that a "FELA action accrues when 'the plaintiff in the exercise of reasonable diligence knows *both the existence and the cause* of his injury.'" *Mix v. Del. & Hudson Ry. Co.*, 345 F.3d 82, 86 (2d Cir. 2003) (emphasis added) (quoting *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1080 (2d Cir. 1988)); *accord United States v. Kubrick*, 444 U.S. 11, 120–25 (1979).

Defendant's argument for dismissal is based on the notion that all Plaintiff's elbow injuries—in particular, tendonitis and a pinched nerve—are the same. The Court disagrees. Certainly, if Plaintiff were seeking compensation for the tendonitis which he first experienced in 2003, such a claim would be time-barred. However, Plaintiff seeks recovery only for the ulnar nerve compression which he first noticed in the spring of 2010 and for which he first received treatment on June 14, 2010, roughly nineteen months before filing the instant action. Even if Plaintiff knew in 2003 that his employment was the cause of other injuries for which he does not now seek compensation, Plaintiff did not know then of the existence of the nerve injuries. *Cf. Mix*, 345 F.3d at 86. Thus, Plaintiff demonstrates that his claim was brought within the three-year limitations period. *Cf. Hernandez*, 2013 WL 822322, at *2. Accordingly, summary judgment based upon a failure to bring the action within the limitations period must be denied.

## IV. LOCOMOTIVE INSPECTION ACT

Defendant asserts that Plaintiff appears to claim the M-2 and M-6 cars are defectively designed, which defect caused his injuries. If so, Plaintiff's claim would be barred or preempted by the Locomotive Inspection Act. *Kurns v. R.R. Friction Prods. Corp*, 132 S. Ct. 1261, 1270 (2012) (holding that Locomotive Inspection Act, 49 U.S.C. §§ 20701–20703, preempts state law design defect claims). However, Defendant mischaracterizes Plaintiff's claims and Defendant's own proffered evidence, which concern whether Defendant properly maintained the barrel doors to prevent repetitive ergonomic injuries. Accordingly, summary judgment based upon this

preemption argument must be denied.

**V. FELA CAUSATION AND NEGLIGENCE**

The Federal Employers' Liability Act states in pertinent part:

> Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, . . . or other equipment.

45 U.S.C. § 51. Plaintiff alleges that Defendant failed to properly ensure that his repeated opening of the barrel doors between rail cars would not cause him ergonomic injuries. Defendant asserts that Plaintiff has insufficient evidence to show either causation or a breach of duty.

**A. Causation**

FELA's language on causation "is as broad as could be framed." *CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2636 (2011) (citing *Urie v. Thompson*, 337 U.S. 163, 181 (1949)). "Given the breadth of the phrase 'resulting in whole or in part from the [railroad's] negligence,' and Congress' humanitarian goals, . . . in comparison to tort litigation at common law, a relaxed standard of causation applies under FELA." *Id.* Thus, "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury . . . for which damages are sought." *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957), *quoted in CSX Transp.*, 131 S. Ct. at 2636. This test has displaced common law standards of proximate causation. *CSX Transp.*, 131 S. Ct. at 2639.

"Circumstantial evidence, expert testimony, or common knowledge may provide a basis from which the causal sequence may be inferred." *Ulfik v. Metro-North Commuter R.R.*, 77 F.3d

54, 60 (2d Cir. 1996); *cf. Williams v. Long Island R.R.*, 196 F.3d 402, 407 (2d Cir. 1999) ("[U]nder FELA the jury's power to draw inferences is greater than in common-law actions." (internal quotation marks and citation omitted)). Expert testimony is unnecessary where "there is a generally understood causal connection between physical phenomena . . . and the alleged injury that would be obvious to laymen." *Tufariello v. Long Island R.R.*, 458 F.3d 80, 88 (2d Cir. 2006); *accord Ulfik*, 77 F.3d at 59; *Kendall v. Metro-North Commuter R.R.*, No. 12 Civ. 6014 (DLC), 2014 WL 1884428, at *5 (S.D.N.Y. May 12, 2014). Expert testimony is only required where "special expertise [is] necessary to draw a causal inference." *Ulfik*, 77 F.3d at 59 (quoting *Claar v. Burlington N. R.R.*, 29 F.3d 499, 504 (9th Cir. 1994)).

Here, ignoring the expert opinions which are not necessary to demonstrate causation, Defendant's proffered evidence does not demonstrate the absence of a genuine dispute of material fact. One of Defendant's witnesses acknowledges that it may take considerable force to open the barrel doors and that the repetitive motion of opening them may be an ergonomic risk factor. Plaintiff, who works multiple cars per trip, going back and forth between cars via the heavy barrel doors collecting tickets, testified that there is often a suction creating resistance as he opens the doors. The SOMA Report corroborates Plaintiff's testimony concerning doors sticking due to overly tight sealing gaskets. Based on this evidence, the causal relationship between elbow injuries and the repeated opening of heavy doors would be obvious to laymen. Accordingly, Defendant's motion for summary judgment based on Plaintiff's failure to demonstrate causation must be denied.

**B. Breach of Duty**

A railroad employer owes "a duty to provide its employees with a safe workplace, which it has breached if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees." *Tufariello*, 458 F.3d at 87. As with causation, "a relaxed standard of negligence applies in FELA cases in this Circuit." *Williams*, 196 F.3d at 406; *accord Kendall*, 2014 WL 1884428, at *7. Thus, "an employer may be held liable under FELA for risks that would otherwise be too remote to support liability at common law," *Tufariello*, 458 F.3d at 87 (quoting *Ulfik*, 77 F.3d at 58), as "the quantum of evidence that suffices in FELA cases is significantly lower than in ordinary torts cases," *Nelson v. Metro-North Commuter R.R.*, 235 F.2d 101, 106 (2d Cir. 2000).

Defendant asserts that Plaintiff has no evidence demonstrating that it had actual or constructive notice of the condition of the barrel doors. Defendant also asserts that the type of injury Plaintiff suffered was not reasonably foreseeable. However, the SOMA Report, of which Defendant has been in possession since 1997, clearly identifies opening the barrel doors as an ergonomic stressor for conductors' shoulders and notes that barrel doors stick due to tight sealing gaskets. Defendant's own witnesses testified that Defendant does not test the force required to open barrel doors when performing maintenance, whereas the SOMA Report clearly recommends minimizing the required force to roughly 25 pounds. Furthermore, the data collected by Morrissey and Schaible—which Defendant could have collected simply by using its own pressure gauges—tends to show that, at least for the train cars examined, the force required to open barrel doors often exceeds the SOMA Report's 25-pound recommendation. Based on this evidence, Defendant should have known and could reasonably have foreseen that opening the barrel doors is an ergonomic stressor for parts of conductors' arms other than shoulders, such

as their elbows.[5] Thus, Defendant does not demonstrate the absence of a genuine dispute of material fact as to whether it breached a duty to provide Plaintiff with a safe work environment by improperly maintaining the barrel doors.

Accordingly, Defendant's motion for summary judgment must be denied.

**VIII. CONCLUSION**

For the reasons stated above, Defendant's motion for summary judgment is DENIED. Defendant's motion to preclude expert testimony is DENIED without prejudice to renewal as a motion *in limine*. The Clerk of Court is respectfully directed to terminate this motion (Doc. 30).

Dated: July 8, 2014
White Plains, New York

SO ORDERED:

NELSON S. ROMÁN
United States District Judge

[5] The instant case is distinguishable from *Williams v. Burlington Northern & Santa Fe Railway Co.*, 13 F. Supp. 2d 1125, 1129–30 (D. Kan. 1998), wherein the Plaintiff's non-expert evidence consisted solely of a "conclusory allegation that . . . [the] [d]efendant [failed] to properly educate and/or warn its employees of the dangers and risks of occupational carpel tunnel syndrome," and from *Dent v. Consol. Rail Corp.*, No. 98-3614, 1999 WL 551402, at *1, 187 F.3d 635 (Table) (6th Cir. July 20, 1999), wherein the court held that a railroad was not required to train its engineer not to panic after the whistle handle broke so that "he would have avoided anxiety and panic and avoided falling on his suitcase when faced with an impending rail crossing accident" since the engineer should have acted "with common sense in an emergency situation."